17068

W. ROBERT MAXWELL *ET AL.,* Respondents, v. SHERMAN F. SMITH *ET AL., Appellants*

(89 S. E. (2d) 280)

*Messrs. Edens & Woodward,* of Columbia, *for Appel-
lants,*

*Messrs. Samuel R. Preston* and *Gene V. Pruet,* of Colum-
bia, *for Respondents,*

*Messrs. Edens & Woodward,* of Columbia, *for Appellants,*

September 26, 1955.

LEGGE, Justice.

Respondents, property owners in a residential subdivision known as Lakewood, brought this suit in their own right and on behalf of all others similarly situate seeking injunctive relief, both prohibitory and mandatory, from alleged violations by appellants of certain restrictive covenants applicable to property within the subdivision. Specifically, the complaint was directed to: (a) a structure variously referred to in the record as "pump house", "tool house", "barn", "shack", and "community house", but which we shall designate as "storehouse", located in an area shown on the original plat of the subdivision as "Spring Branch Road", and which allegedly violated restrictive covenants relating to type of structure, lot area, and set-back distances; and (b) eleven small "minnow pools", each about twenty feet long by ten feet wide, a larger "feeding lake" about one-half acre in area, and a small pump house, all constructed on Lots 2, 3 and 4 in Block C of the subdivision allegedly in connection with the raising of live bait for commercial purposes, in violation of the covenants providing that all lots in said area should be used for residential purposes only.

Answering, appellants denied violation of any of the restrictive covenants; alleged that the "storehouse" and the area upon which it was constructed are not within the scope of said covenants, and that the said "storehouse" is in process of being "renovated" into a ranch type residence; denied that they were using the minnow pools for raising bait for commercial purposes and that any commercial transactions were conducted on the property; and alleged that the area in which the minnow pools were constructed had been beautified by the planting of grass and shrubbery. By amendment to their answer they further alleged that the "storehouse" had been erected in 1948; that in October, 1953, they had begun to improve it and had, in plain view of respondents and without objection on their part, expended thereon approximately $3,000.00 before this suit was commenced on November 20, 1953; that the pump house and fish pools had been constructed in December, 1952, at a cost of approximately $2,000.00, in plain view of respondents and without objection on their part until the commencement of this suit; and that respondents were therefore guilty of laches and not entitled to equitable relief.

On June 23, 1954, the Master for Richland County, to whom the cause had been referred generally, filed his report, finding that appellants had violated and were violating the restrictive covenants as charged in the complaint, and that the defense of laches had not been established, and recommending that appellants be permanently enjoined from continuing to violate the covenants in question and that they be required to remove the "storehouse" from the parcel of land on which it is located, and to remove the pump house and minnow pools and feeding lake and the debris therefrom, and to fill the resulting holes.

On appeal to the County Court, all exceptions to the Master's Report were overruled, the findings and conclusions of the Master were affirmed, and the relief recommended by the Master was ordered. From that decree the present appeal was taken.

There are eight exceptions, and the "Questions Involved", as stated by appellants, number thirteen. Stated somewhat more briefly, the issues are as follows:

1. Does the "storehouse" on its present site constitute a violation of any of the restrictive covenants?

2. Are respondents precluded by their laches from enforcing such covenants in respect to the "storehouse"?

3. Is the decree of the lower court concerning the storehouse too vague?

4. Is the covenant restricting the use of lots to residential purposes violated by the construction and maintenance, on vacant lots, of the minnow pools, pump house and feeding lake collectively; and, if so, can the maintenance of the feeding lake separately be justified?

5. Did the pleadings and proof warrant the finding that the debris from the excavation incident to construction of the minnow pools and pump house, deposited on the adjacent area, constitute an aesthetic nuisance and should be removed?

6. Are respondents precluded by their laches from enforcing the restrictive covenant in respect to the minnow pools, pump house and feeding lake?

7. Are the injunctive provisions of the decree of the lower court too broad?

8. Did the lower court have jurisdiction of the subject of the action?

The Lakewood property, comprising 87.8 acres, was conveyed to the appellant Sherman F. Smith by deed of Estelle Skinner dated April 15, 1948, wherein it was described by reference to a plat made by Tomlinson Engineering Company under date December 17, 1947. On the same day that he acquired the property, Mr. Smith conveyed to the Supervisor and County Board of Commissioners for Richland County rights-of-way for the roads shown on the Tomlinson plat, including Spring Branch Road. In June or July, 1948, he constructed, at a location just west of Spring

Branch Road as actually in use, the storehouse to which we have referred, the same being a wooden structure approximately twenty by forty feet, for the purpose of housing a water pump and large pressure tank and also for storage of construction materials.

By instrument dated September 10, 1948, Mr. Smith imposed upon the area of the subdivision certain restrictive covenants, to which we shall later refer in some detail. By deed dated February 23, 1950, he conveyed to his wife, Norma M. Smith, co-appellant here, all of his unsold property in Lakewood. He continued, however, to handle the development of the subdivision as her agent.

It having been discovered that the storehouse before mentioned had been constructed in the right-of-way of Spring Branch Road as shown on the Tomlinson plat, a resubdivision of Block D was made by Wingfield & Rudisill under date July 31, 1951, showing the actual location of Spring Branch Road at that point; and thereafter on or about August 26, 1953, deeds were exchanged with the Supervisor and County Board of Commissioners of Richland County whereby a portion of Lot No. 10 in Block A, owned by the respondent Zahler, and a portion of Lot No. 1 in Block D, owned by the respondent Maxwell, as shown on the Tomlinson plat, were conveyed to the Supervisor and County Board as the relocated right-of-way of Spring Branch Road, and they released a corresponding portion of the right-of-way shown on the Tomlinson plat, which resulted in the enlargement of Lot No. 10 in Block A and the vesting in Mrs. Smith of title to a parcel of land, roughly triangular in shape, containing approximately 3,900 square feet, on which the "storehouse" had been built.

By the instrument of September 10, 1948, before mentioned, the appellant Sherman F. Smith, reciting his ownership of the ninety-six lots shown on the Tomlinson plat of December 17, 1947, of the subdivision to be known as Lakewood, convenanted and imposed "upon said area and the lots composing the same as now shown on said plat and

such as may hereafter be added thereto" certain conditions and restrictions, of which the following are specifically invoked here:

(a) "All lots in said area shall be used for residential purposes only. * * * "

(b) "No building shall be located on any residential building plot nearer than fifty (50) feet to the front building line, nor nearer than twenty-five (25) feet to any side street line, nor nearer than ten (10) feet to any property lines. * * * "

(c) "No residential structure shall be erected or placed on any building plot which plot has an area of less than any of the lots as shown on the plat of Lakewood above referred to."

(d) "No trailer, basement, tent, shack or barn erected on said tract shall at any time be used as a residence temporarily or permanently, nor shall any structure of a temporary character be used as a residence."

Although its "renovation" has not been completed, the work having been stopped when the present action was commenced, Mr. Smith's testimony establishes the fact that the "storehouse" is now a residential structure. It is undisputed that its southern end is three-tenths of a foot from the northern boundary line of Lot No. 10 in Block A, and that its eastern face is approximately twenty feet from Spring Branch Road. Also undisputed is the fact that the triangular plot on which it stands, containing between thirty-eight hundred and thirty-nine hundred square feet, is much smaller than any of the lots shown on the Tomlinson plat. As thus located, the structure violates covenants (b) and (c) above quoted.

Appellants contend, however, that inasmuch as the "storehouse" had been built before the restrictions were imposed, and on a parcel not designated on the Tomlinson plat as a building lot, neither the structure nor the plot on which it is located is within the scope of the restrictions. We agree

with the lower court that such contention cannot be sustained. The instrument of September 10, 1948, executed by Mr. Smith, imposed the restrictions upon the area of the subdivision as shown on the Tomlinson plat, and upon "the lots composing the same as now shown on said plat and such as may hereafter be added thereto." The error whereby the location of the structure was indicated on the original plat as the right-of-way of Spring Branch Road does not alter the fact that presently the structure is residential and the plot on which it stands is therefore a residential building plot within the purview of the covenants in question.

Are respondents precluded by laches from invoking the covenants? As was stated in *Archambault v. Sprouse,* 218 S. C. 500, 63 S. E. (2d) 459, the question of laches is largely a factual one, and its determination in an equity case by concurrent findings of the Master and the trial court will not be disturbed on appeal unless such findings are without evidentiary support or against the clear preponderance of the evidence.

Until October, 1952, the "storehouse" had been used occasionally for meetings of the Lakewood Community Club, and no objection was made by any of the property owners to such use of it. The respondent Maxwell, who was the secretary and treasurer of the club, testified that at the last of such meetings Mr. Smith, declining to consider the suggestion that the club take over the structure, stated that he might renovate it for rental or sale, whereupon objection to such use was made by Maxwell and several other property owners. According to Mr. Maxwell, some were "very boisterous" in their objection, and the meeting adjourned at that point. Mr. Smith did not recall the meeting in question or whether the possibility of his renovating the house was mentioned at that time, but he testified that no objection to the renovation was ever made until the work started in October, 1953. At all events, the record indicates that after the meeting in October, 1952, nothing was done by Mr. Smith until a year later when, without communica-

tion with the property owners, he began the renovation or conversion of the structure. Mr. Maxwell, whose property lay just across the road from it, testified that in October, 1953, seeing carpenters working there, he went to Mr. Smith and asked him what was being done, and, upon being informed that the building was being converted into a residence, he consulted counsel on the same, or the next day. Mrs. Zahler, another of the respondents, testified that before she bought the adjoining property, in September, 1950, she questioned Mr. Smith concerning the "storehouse", which she found objectionable as an "eye-sore", and that he assured her that he was going to use it only until the development of the subdivision was completed, that he would then turn it over to the community as a clubhouse, and that it would never be used as commercial or rental property.

The testimony to which we have referred amply supports the findings of the lower court on the issue of laches with respect to the "storehouse", and the exceptions thereabout are overruled.

Is the decree of the lower court concerning the "storehouse" too vague? In discussing this question, appellants state that the lower court "seems to find" that this structure is a shack or barn which under the restrictions cannot be used as a residence anywhere in the subdivision; and that they are therefore unable to determine whether its removal to a larger lot within the subdivision would constitute compliance with the requirements of that portion of the decree which commands its removal from its present site and enjoins its use "in any manner in violation of the restrictive covenants and conditions."

In paragraph 22 of his report, the Master concluded "that the structure in question violates the restrictive covenants which are applicable to the parcel of land on which the structure stands in the following respects:

"(a) It is located too close to the southern and western boundaries of the parcel of land in question;

"(b) It is located too close to the front boundary line;

"(c) It is located on a plot of land which has an area of less than any other lot shown on the plat of Lakewood; and

"(d) It was a shack or barn of a temporary character and *is* the nature of a building or structure which is precluded by the restrictions from use as a residence, either temporarily or permanently".

The word "is" that we have italicized is obviously the result of a clerical error, and was intended to be *"in"*. So construed, reference to the "storehouse" as a "shack or barn of a temporary character" and thus forbidden to be used as a residence related to its original, and not to its present, condition. It is true that its conversion into a residential structure has not been completed; but its character as a pump house or tool house or shack or barn has been changed, and it must now be considered, in relation to the restrictive covenants, as a residence in process of construction. The decree of the lower court was not intended to, and does not, prohibit its removal to a residential building plot of sufficient area within the subdivision, there to be located and completed in conformity with the requirements of the restrictive covenants applicable to residential structures.

We come now to consider the exceptions embodying appellants' contention that the minnow pools and the pump house and the half-acre lake constructed to feed said pools do not, in themselves, violate the covenant restricting the use of lots within the subdivision to residential purposes only.

The minnow pools, eleven in number, are located on Lots 2, 3 and 4 of Block C; the half acre lake, the overflow from which feeds these pools, is located on Lots 2 and 3 of Block C; and approximately on the line between Lots 3 and 4 of Block C is a small pump house. The pools and

the lake were constructed in December, 1952, and thereupon Mr. Smith stocked the lake with minnows, which, according to his testimony, were to be later taken from the lake to the minnow pools and there held preparatory to transportation into the city for sale. The pump house was constructed in September, 1953, but at the time of the hearing before the Master had not been "installed." Lake, pools and pump house were all elements of a commercial installation, in contravention of the covenant in question. It is argued, however, that the covenant relates to the use of these things, not their existence, and that the injunction should have been issued, if at all, only against their use for commercial purposes. Also, appellants contend that the evidence shows that the commercial plan has been abandoned, and that therefore the feeding lake, considered as apart from the pump house and holding pools, does not violate the covenant restricting the use of lots to residential purposes.

As to whether appellants have in fact abandoned the idea of operating the lake and pools for commercial purposes, the testimony is not very clear. The respondent Fitch testified that Mr. Smith told him he was selling about a thousand minnows a week, but the time of this conversation is not mentioned. Mr. Smith testified that the fish project "is in the planning stage", and that he has never "completed any transaction of fish on the Lakewood property". His only reference to abandonment was in relation to another lake in which he had originally intended to keep fish prior to their being put in the holding pools, as to which he testified that "it didn't work satisfactorily, and I abandoned that part of it".

But even considering their commercial use as at an end, it does not follow that the lake and pools conform, either singly or collectively, to the requirement of the covenant that "all lots in said area shall be used for residential purposes only". Whether or not their existence, or the existence of any of them, if incidental to the use of a residence,

would offend the covenant, is a question not before us. They are, in fact, on vacant lots, and must, under the testimony here, be viewed as not incident to residential use. Their existence, therefore, was properly held by the court below to be not in conformity with the requirement of the covenant.

Nor do we think that the factual circumstances require reversal of the concurrent findings below on the issue of laches as applied to the pools, lake and pump house. The respondents' properties were purchased, respectively, on the following dates: Zahler, Lot 10 in Block A, in September, 1950; Maxwell, Lots 1 and 2 in Block D, in February, 1952; Fitch, Lot 8 in Block D, in December, 1952. The plat in evidence indicates that the Zahler property is located at least six hundred fifty feet from the nearest of the three lots on which the pools, lake and pump house were constructed; the Maxwell property, at least three hundred feet; and the Fitch property, directly across the road. As before stated, construction of the pools and lake began in December, 1952; the pump house was built in September, 1953; and the present action was brought in November, 1953. Except for the fact that Mr. Fitch, according to his own testimony, saw the construction work from its beginning, was told by Mr. Smith that he (Smith) had fish in the lake, made no objection at the time, and later himself put some minnows in one of the small pools in an effort to stop the breeding of mosquitoes, there is nothing in the record from which it can be inferred that respondents did anything to indicate their assent to these installations. It must be remembered, too, that unless action or inaction of the property owners was such as to mislead him or to evidence their assent to his operations, Mr. Smith, as the author of the covenant which he was violating, should not be heard to insist that immediate resort to the courts is prerequisite to the enforcement of their rights. "Mere lapse of time, although an important, is not necessarily a decisive, consideration." *Arch-*

*ambault v. Sprouse,* 215 S. C. 336, 55 S. E. (2d) 70, 72, 12 A. L. R. (2d) 388.

Paragraphs 24, 25 and 26 of the Master's Report read as follows:

"24. I find that the defendants have constructed several 'holding pools' for minnows on Lots 2, 3 and 4 of Block C of Lakewood and that they have placed on Lot 4, Block C, a small shack which they plan to use as a pump house to be used in connection with the pools, and further that a larger pool of about one-half acre in size has been constructed to feed these minnow pools.

"25. I find that the minnow pools, the feeding pool and the lake or pond on Lots 2 and 3 of Block C, together with the pump house, which I find is located within twenty feet of Circle Drive, have been placed there for use in gathering and holding bait in connection with commercial sales made and/or to be made by Mr. Smith.

"26. I find that the remains from the making of the excavations for these pools and ponds and the pump house are unattractive and unbecoming to a subdivision such as Lakewood and constitute what is sometimes called an aesthetic nuisance".

In paragraph 36 of his report, the Master recommended "that the defendants be ordered, directed and required to remove the pump house and fish holding pools and the pond from Lots 2, 3 and 4 of Block C in Lakewood; and that the holes which constitute such pools and pond be filled to their natural level and the debris removed therefrom be removed from said lots".

In the decree from which the present appeal is taken, the lower court, after reciting its examination of the evidence, but without discussing it, concluded that the findings and conclusions of the Master were amply sustained thereby. Accordingly, all exceptions were overruled and it was ordered, among other things, that the defendants remove the pump house and fish holding pools and the pond from Lots

2, 3 and 4 of Block C, fill said ponds to their natural level, and "remove the debris from said lots".

The subdivision and development of the Lakewood tract was pursuant to a general scheme of improvement intended to insure the use of the property as an attractive residential area. In furtherance of this purpose Mr. Smith imposed upon the area certain specific restrictions and conditions, including a covenant that nothing should be done on any lot "which shall be or become an annoyance or nuisance to the neighborhood." By their purchases within the subdivision, the respondents became parties to the restrictive covenants, and among them and the appellants there arose mutuality of covenant and consideration. *Sprouse v. Winston,* 212 S. C. 176, 46 S. E. (2d) 874; *Martin v. Cantrell,* 225 S. C. 140, 81 S. E. (2d) 37. Such covenants, while subject to the rule that doubt should be resolved in favor of the free use of property, are not to be construed so as to defeat the plain purpose of the contractual instrument. *McDonald v. Welborn,* 220 S. C. 10, 66 S. E. (2d) 327.

Although the complaint in the case at bar did not specifically invoke the covenant above quoted, or contain any allegation concerning the deposit of debris, Mrs. Zahler, whose property on Lot 10 of Block A is immediately adjacent to the "storehouse" plot, was permitted without objection to testify that prior to the renovation of the "storehouse" a pile of unsightly and offensive debris had been deposited on that plot very near her property line. She admitted that at the time of the hearing the place was somewhat cleaner; and photographs of the "storehouse" area in its present condition show no accumulation of debris. But there was no finding as to the deposit of debris in the vicinity of the storehouse, and that matter is not in issue. We have mentioned it only because our examination of the record reveals no other testimony whatever to the effect

that any owner of property in the subdivision is, or has been, annoyed by any deposit or accumulation of debris.

Under the testimony of the respondent Fitch there were put in evidence a number of photographs of the area of the pools, lake and pump house on Lots 2, 3 and 4 of Block C. One of these photographs shows a large mound of dirt and construction debris near the pump house; but there is not a word of testimony by this witness or by any other property owner suggesting that it was offensive to any of them or an "annoyance or nuisance to the neighborhood".

Appellants contended in the court below that Paragraph 26 of the Master's Report, quoted above, was without support in the evidence. That contention is renewed here, and is sustained.

Appellants suggest that the decree of the lower court is illegal and unenforceable to the extent that it purports to enjoin them from "violating the restrictive covenants described in the complaint and the Master's Report", from using the storehouse "in any manner in violation of the restrictive covenants and conditions", and from using Lots 2, 3 and 4 of Block C "for any other purpose than as allowed by the restrictions". The decree must be construed in the light of the issues before the court. *Jackson v. Johnson,* 186 S. C. 155, 195 S. E. 239. It was not intended, and did not purport, to prohibit violations of any of the restrictive covenants other than those invoked under the pleadings and proof.

Finally, it is contended by appellants that the County Court was without jurisdiction "because the amount in controversy exceeded six thousand dollars". It is of course immaterial that the jurisdictional issue was not raised in the lower court, for it is elementary that the trial court's jurisdiction of the subject matter may be questioned for the first time upon appeal. *Langford v. State Board of Fisheries,* 217 S. C. 118, 60 S. E. (2d) 59. But we find no merit in appellants' contention here.

The jurisdiction of the County Court of Richland County is prescribed by Section 15-764 of the 1952 Code of Laws, the applicable portion of which reads as follows:

"Said county court shall have concurrent jurisdiction with the court of common pleas in all civil cases and special proceedings, both at law and in equity, when the amount demanded in the complaint does not exceed six thousand dollars or when the value of the property involved does not exceed six thousand dollars and in all other civil cases and special proceedings, both at law and in equity, in which there is no money demand or in which the right involved cannot be monetarily measured. * * * "

In their Exception No. 8, appellants contend "that the evidence conclusively shows that the amount in controversy, that is to say, the value which defendants by said order have been deprived of, exceeds $6,000.00, to wit: Value of property conveyed to County Board of Commissioners for property on which 'community house' is situate, $3,500.00; renovations to 'community house', $3,600.00; construction of pools and pond, $1,580.00; totaling $8,680.00, all of which is destroyed by said order". This exception is founded on two premises, both unsound, viz.: (1) that the issue of jurisdiction vel non is controlled by the words "when the value of the property involved does not exceed six thousand dollars", and (2) that the "value of the property involved" is to be measured by the financial loss that will result to the appellants from compliance with the injunctive provisions of the decree. But even if both premises were correct, the fallacy of the conclusion becomes apparent upon analysis of the items listed in the exception. The plot on which the "community house" is situate, and for which, according to Mr. Smith's testimony, $3,500.00 was "in effect" paid by the exchange of deeds with the County Board, is still owned by Mrs. Smith. It was always too small to meet the requirements prescribed by Mr. Smith for residential building lots; and its value has not been destroyed by the decree. By the same token, the "renovations"

to the "community house" are still there, and the building as it now stands is not affected by the decree except to the extent that it must be moved to a permissible location. There is no evidence as to the probable cost of such move. By removal of the pools and pond, appellants will have lost the amount expended in their construction, which the record indicates was $1,480.00, not $1,580.00; and they will be put to some expense, the amount of which is nowhere suggested in the record, in having the resulting holes filled. But it is clear that the evidence does not require the conclusion that the decree has deprived appellants of property exceeding six thousand dollars in value.

In the instant case there was no money demand, and the plaintiff's rights were not susceptible of monetary measurement. Jurisdiction was conferred upon the lower court by the words of the statute applicable to such cases. It may be noted, in passing, that there was no appeal from the finding by the Master, which the County Court affirmed, that the plaintiffs were without adequate remedy at law. The statutory provision relating to jurisdiction "when the value of the property involved does not exceed six thousand dollars" has no application to an action such as the present. Cf. *De-Treville v. Groover*, 219 S. C. 313, 65 S. E. (2d) 232, where the identical issue appears to have been raised in the lower court but abandoned on appeal.

The judgment of the lower court is reversed insofar as it purports to order, direct and require the appellants to remove from Lots 2, 3 and 4 of Block C debris from the excavation incident to construction of the pump house and to the making of the minnow pools and pond on said lots; and in all other respects it is affirmed.

BAKER, C. J., and STUKES, TAYLOR and OXNER, JJ., concur.